Yeah. You really watched it. Yeah, I know that. No rush. You're on whenever you're ready. Please, whenever you're ready. Good morning. I guess I haven't announced the case. I'm sorry. 17-1169, Medtronic v. Barry. Good morning. Good morning. May it please the Court. Mark Fleming with my colleague, Eric Fletcher, on behalf of Medtronic. This appeal can be decided based on three points, none of which is disputed. First, there are two prior art references, each of which discloses all claim elements but one. The 928 application discloses everything but rotation. MTOS discloses everything but mechanically linked handles. Second, in each case, the missing element is disclosed by the other reference. MTOS has rotation. The 928 has mechanically linked handles. And third, the evidence of motivation for both combinations is uncontroverted. As for adding rotation from MTOS to the 928, it's admitted that long before the Barry patents, doctors knew the importance of derotating vertebrae and were motivated to do it. And as for linking of the handles of MTOS, neither Barry nor the board has ever denied that it is a basic mechanical principle well within the knowledge of a skilled artisan. And it's motivated by the incentive to make it easier to move the vertebrae together, which surgeons were already doing with their hands. Connecting the handles together with a simple mechanical link lets the surgeon do it more evenly, reduces the risk of damage, frees up one hand for other purposes, and notably the board never found otherwise. We submit that the board made... I'm sorry, the board never found that those benefits, if somebody had thought of it, wouldn't have existed. But did the board... The question of whether somebody, a regular old person of ordinary skill in the art, would have seen the benefits and been motivated to do it is a factual question, and the board did not find in your favor on that. The board made no finding on that, Judge Toronto, and that, we submit, is the legal error in the board's analysis. The board stopped its findings once it determined that MTOS itself did not disclose a mechanical linkage. That was a legal error because this isn't an anticipation case. It should have gone on to consider whether a skilled artisan would have been motivated to take the mechanical linkage undisputedly disclosed in the 928, which was well within the capability of a person of ordinary skill, and simply applied it to the procedure in MTOS because it was application of a known technique to a piece of prior art ready for the improvement in the language of KSR. There's no question that MTOS has multiple handles connected to multiple pedicle screws. The board found on page 35, the only element missing is to, quote, connect the ends of the extensions or handles together, close quote. And there was plenty of evidence, and it's not disputed, that the 928 expressly discloses just such a physical structure. Dr. Linke said it's a basic concept of mechanical connection, and neither Barry nor the board ever denied that, nor could they have. It's clear that taking multiple switches or handles and connecting them with a bar so that they can be moved all at once is something well known. It's common in household circuit breakers and other applications. And there is no finding, Judge Toronto, to your question to suggest that that was somehow inventive and that a person of ordinary skill in the art, someone with a medical degree and years of experience in designing fixation devices, would not have thought of that and used it for the obvious benefits that it provided. Notably, Barry's own expert, Dr. Yasser, himself admitted that he, in his own practice, had moved more than one handle at the same time. He admitted that the prior art, including the Sook reference, discloses distributing the rotational torque among several pedicles to help prevent breakage. And he admits that it's predictable that if you connect the d-rotators, they're naturally going to move together. It's an ordinary principle of mechanical physics. So to achieve the many predictable benefits of simultaneous rotation of vertebrae, the artisan would obviously be motivated to combine the physical structure, the feature in the 928 application that connects multiple engagement members with the individual engagement members already disclosed in MTOS. That on its own is enough. And I haven't even mentioned the evidence of our expert, Dr. Lenke, who spelled this out in even greater detail in his declaration on 1511 of the appendix, where he talks about the benefits of further facilitating simultaneous movement of vertebrae using fewer hands, using less force, and safely distributing the force. Second more... I'm sorry, which reference teaches the single-action simultaneous application of force, manipulative force? The 928 application has multiple posts that simultaneously compress and distract. Right, it has two knobs, right? It has two knobs, and it has transverse connections across the multiple engagement members. I guess my question about that one is you'd have to use both knobs in order to get all of the members activated, right? So now we're talking about the alternative obviousness combination, right? Taking the 928 and combining it with rotation from MTOS. I can turn to that if Your Honor wishes. I just wanted to conclude the point about the first and we think the clearest combination, which is taking the rotation, which is already in MTOS. Every element of the claimed method is there, and all you're doing is adding a bar to move them together simultaneously. And the bar, or the linkage, comes from the 928. That's the only feature you need to add. In the 928, a knob can... What is it? The knob is moving one of the members, right? The feature that can be combined is not limited to the knob. You can combine the physical linkage, so the threaded rod that ties them all together, and the skilled artisan can use that. Right, but I'm just trying to remember how the 928 operates. There's one knob. There are three, I don't know what to call them, pegs. Yeah, posts or engagement members, yeah. And one knob moves one post on the end of the three, and then the other knob moves the other end post, right? So I guess what I'm trying to think is, where in the 928 is there a single action that's moving more than one post simultaneously? So in paragraph 36, which is on 1800 of the appendix, the 928 discloses that when a knob is turned, guide tubes 102 and 104 will be moved closer together, resulting in compression, or will also be pushed apart, resulting in distraction. And when they're being moved together or pushed apart, it's really one post that's moving, and the other one is, the center one, just stays stationary the whole time. Is that right? When turning one knob, it moves them apart by holding one and then moving them, but you're talking about moving vertebrae in order to treat a spinal deformity. It also separately discloses in paragraph 55 the situation of a treatment of spondylolisthesis, where there would be perpendicular pressure applied downward or upward in order to treat that. That's the paragraph that the board did a pretty exhaustive treatment in analyzing your argument about whether that was going to be causing some form of derotation, right? And they concluded that, no, it doesn't. Well, what they specifically said was it does appear to disclose pressing downward or upward from the posterior of the patient. They did not controvert what is the basic physical principle, that if you're pressing down on one side of something, the other side is going to come up, and if you pull up on it, the other side's going to go down. But that's not rotation. That is rotation, Your Honor. That's absolutely rotation. You're rotating the vertebrae about the spine. This is very clearly illustrated in the video regardless of whether we consider it prior art or not. If you look at the end of Part 3 of the video, the surgeon very clearly, when they talk about derotation forces, pulls up on the screw, and you see this side of the vertebrae go up, the other one goes down, and then at the beginning of Part 4, the surgeon pushes down on the screw, and this side goes down and that one goes up. That is rotation. Before we lose you and you have to sit down, if we were inclined to affirm the finding of patentability or no preponderance of evidence that they're unpatentable, do we have to reach the publication issue? Because I'm trying to figure out to what extent is there some kind of daylight and disclosure between the video and slides versus MTOS. It goes to the point we've been discussing, Judge Chen, which is simultaneous rotation. If Your Honor thinks that simultaneous rotation was not somehow disclosed or evident from the knowledge of one of skill and the art from the 928 and MTOS, the video most assuredly shows simultaneous rotation, and you see that at the beginning of Part 7 of the video. The surgeon's left hand grasps two of the derotators simultaneously, the right hand is pushing down on the rib hump, and they're turned at the same time. So to the extent Your Honor is uncomfortable with a finding that the skilled artisan would have combined MTOS and the 928 to produce simultaneous rotation using the same mechanical link, which is not just the knob. You can press on the knob, obviously. You can also press on the mechanical linkage, and that will achieve simultaneous rotation by moving them together. If the court's not satisfied with that, then the video very clearly shows simultaneous rotation. And so then to the legal issue of whether the video and the slide are in fact printed publications, it appears that the board felt like your side just didn't do enough to explain why these various meetings with, you know, or at least it appears that the board believed that these were all rather small, closed meetings that didn't have enough of an indicia that they were open and free and that the people there would be inclined to share whatever they learned in these closed meetings. Why isn't that determination or finding supported by substantial evidence? On the legal issue, these disseminations were eminently broader than the disseminations in which this court has found them to be enough, like Garrett or MIT or Enhanced Security Research. I mean, at MIT, the paper was only given out to six people. Here it was given out to dozens of people with no restriction on dissemination, and the board never found otherwise. So one of the differences, I think, I remember the cases, is that it is at least fair to read all the previous cases about small numbers of recipients of an actual distribution as speaking of distribution to ordinary skilled artisans. And I took it that the reason that a board thought this case wasn't covered by that was that you had a much more select group. Is that a legal error? That is, if the video and the slides were handed out to 50 super experts, not mere ordinary artisans, would that as a legal matter mean that it wasn't a publication? I think it's a legal error and a factual error. It's a factual error because the board conflated all these different meetings together, whereas only one of them was a meeting of the Spinal Deformity Study Group that was subject to the... On that factual point, what is your evidence that the Colorado and St. Louis meetings were more open than the Scottsdale meeting? Ms. Owens' declaration, she's the one who organized those meetings, presents them as medical education courses. Do you have a citation for that? I can find it, Your Honor. I believe it's... I can find it on rebuttal if I can't get it now. Ms. Owens makes it very clear that she's the one who organizes the medical education conferences, whereas Mr. Poli, David Poli separately testified he organizes the SDSG conferences, and all the statements about who was invited to the SDSG are covered by Mr. Poli's declaration. Ms. Owens is separate. On the legal point, I don't think this court has ever said... Why isn't that an issue of fact for us rather than what is the legal aspect of that discussion? Coming to that, Judge Plager. So the legal problem is simply... And this is why I don't think it matters which conference we're talking about. I don't think this court has ever said that disclosure, in order to amount to a dissemination of a prior art reference, needs to be to someone who meets the baseline level of ordinary skill in the art, as long as the people who get it have ordinary skill in the art or more and have no restriction on disseminating it, which is the situation here. Because you're never... I mean, the person of ordinary skill is a hypothetical construct. It doesn't actually exist. It's not as though someone needs to go out and find a person who exactly meets the specifications of the ordinary skill and say, here's this document that I want to make available to you. As long as it's made to the interested public who will be interested in the subject matter, it doesn't matter whether they are the baseline level of ordinary skill or a higher level of ordinary skill, which is why this issue has never been broached in any of the cases this court has talked about. In MIT, the court didn't say, well, the six people who received it were the absolute baseline of ordinary skill. It just mattered that they weren't, you know, ordinary lay members of the public who wouldn't have absorbed or cared about the content. Here, the people who received it were all spinal surgeons and had no restriction on their ability to disseminate. That said, I think this court does not necessarily need to reach this because the combination of MTOS, which discloses everything, with the simple mechanical linkage between multiple posts, holding them together so that they can be moved simultaneously in order to free up a surgeon's hand and distribute the force to avoid damage and defamation, again, evidence nowhere rebutted by Dr. Barry and certainly not disbelieved by the board, is a sufficient basis to reverse and direct entry of judgment of unpatentability for all the claims. Unless the court has further questions, I reserve the balance of my time. You'll get three, which is even more. Thank you. May it please the court. Good morning. I'm John Almonte here on behalf of Dr. Mark Barry. Let me take the arguments in reverse and talk a little bit about the slides. So the argument before the board was only presented in the reply to petitioner's petition. It's in Appendix 1268 and what they said was that here the unrebutted testimony establishes the video and slides were in fact disseminated and they provide a string site of a bunch of different places in the record, but that's the only evidence the board saw. So a lot of the arguments that you're hearing are different than what the board heard. In their petition, they pointed out that these were all presented at three different meetings across America to several different spinal surgeons and so I think they made at least some prima facie level of a case that that's why they were prior art references because they were disseminated, they were literally handed out to several dozen spinal surgeons across America. Judge Chen, I disagree. Exhibit 1003 was the only exhibit they presented with the petition. The other two binders were presented with as supplemental evidence in response to objections to their petition. So they did make statements, but without the supporting evidence. I'll also point out that the St. Louis meeting, I realized this when I looked at the reply, the great brief at page 22, St. Louis meeting was in fact an SDSG meeting. It was also limited to that small group, but the board made that finding at the final decision. That's hard for me to tell whether the board actually made that fact finding. I mean, the other side was pointing to deposition testimony from Poley as well as declaration evidence saying, look, there were three meetings, but there are two categories of meetings. There's two buckets of meetings. One is the study group where there is some elite members of the field that are exchanging information and commenting on each other's information. And so maybe that looks more like a closed peer review kind of get together. And that was organized by Mr. Poley. Then there's the second category, which appeared to be organized by the logistics coordinator of medicine education meetings, which is Ashley Owens. And she's saying that's a different thing where these are not study group meetings and there were dozens of spinal surgeons that were invited to these. And it's not clear to me at all that the board considered this argument that these were two different buckets of meetings and then explained why it wasn't satisfied that by Medtronic's arguments and statements and declarations and depositions that those were not study group meetings and so therefore have to be considered differently than perhaps the more closed members-only study group meeting. And I would disagree with that. The board did look at the evidence underlying it. Some of the evidence, for instance, that Medtronic cites with the proposition that these were different buckets, they were prepared differently. For instance, Mr. Poley's testimony in appendix 4153 and 4154, all he's saying there is how he prepared the binders. It says nothing about who attended the group. What the board found is that Medtronic did not come forth with enough evidence to show who attended the group and how one of ordinary skill in the art with reasonable diligence or exercising reasonable diligence would have access to these. So the board went through exhaustively and looked at that. The other point in the buckets argument is that... Is it undisputed? What did the board find, if anything, about whether the recipients of slide video at Scottsdale were under any restriction about what they could do with it? So the board made findings about the Spinal Deformity Study Group. The Scottsdale program and the St. Louis program are both Spinal Study Deformity Group sessions. Did it make a finding about whether there was a restriction or even an expectation of non-sharing with anybody that the members would care to do when they got home? No. They made a finding that the members of that were limited to this selected group and that there's no evidence in the record that it was distributed to anyone else or available to anyone else. So why, as a legal matter, should that matter? I don't think it should. I don't think... I think the board reached the factual findings based on what it had. It just simply did not have enough information. I don't think there's a legal error. The board looked at everything it did and tried to ascertain whether one of skill in the art could, with reasonable diligence, access the video and the slides and found that they didn't have enough evidence to support that. I guess I'm confused by a few different things. One appears to be the idea that the board might have latched onto that in the study group we had, say, the top 20 spinal surgeons of America and they were the ones that were going to this meeting and learning about new and interesting things. Why wouldn't one of ordinary skill in the art who wants to learn more about any techniques in spinal surgery want to try to consult one of the top 20 spinal surgeons of America to see if they had any information about the latest techniques? That seems almost like the most common source that you would go to. And lo and behold, these 20 surgeons, in fact, had CDs and slides of Dr. Lenke's latest technique. And Judge Shum, what you're saying sounds perfectly reasonable. It makes perfect sense. The problem is there's no evidence in the record to support that. And so the board did not have that. Medtronic did not provide that. There's no testimony from a surgeon saying, I'm just a run-of-the-mill surgeon and these are the people to whom I would look. I understand that, but I'm trying to understand what the board keyed off on ultimately in concluding that this wasn't a printed publication. And if the pivot point is that, well, these were the Hall of Fame spinal surgeons of America only. And so, therefore, that's not enough. I don't know if that's correct, if there was no attached expectation of confidentiality in whatever was being discussed in such a meeting. And I think that's the concern. And I understand that concern. And all I can say is the board looked at all the evidence before it and reached a conclusion. So I don't know what else they would have looked at. I understand it's possible that physicians could have accessed that information. Well, they could have talked about, was there a reasonable expectation of confidentiality in the materials that were distributed in Scottsdale, in St. Louis, and in Colorado Springs. We have Dr. Lenke who has said in one declaration there was no restriction on the people that received the materials in Colorado or in St. Louis. And then they also, on that side, argued that those were not study group meetings. Those were broader medical education meetings where spinal surgeons registered for that. And it totals up to 75 different spinal surgeons that were not within the study group. That's something that I didn't see the board actually confront and address. And the second point is not correct because the St. Louis meeting was in fact an SDSG meeting. Well, Colorado. So it was 55. Isn't Colorado the one that, I don't think you mentioned that yet. I'm sorry, Your Honor. Yes, the Colorado one is the one that we're discussing. If we look at this as a question of fact, were these two items, the video and the slides, were they publicly available? Our question then is is substantial evidence in the record to support the board's conclusion. Would Medtronic have a burden to show that they were publicly available? Yes. It's Medtronic's burden throughout the proceeding to show that the claims are unpalatable and including the burden to present sufficient evidence to show that they were publicly available and so were prior art. So in the absence of evidence that they were publicly available, how do we end up treating this board's fact-finding? So you affirm the board's fact-finding based on substantial evidence. They looked at the evidence they had and reached a conclusion based on that evidence. Hypothetically, if there was one meeting, the Colorado meeting, and there were 51 attendees, okay, and then six of the 51 received a copy of the video, would that be a printed publication? I think it depends on what the underlying evidence is about whether that was available or not. Because that's the facts of MIT. Right. But there are other facts of MIT, I believe, although I don't have them memorized about how that was potentially available. It's a very short opinion. It says 50 to 500 attendees of a conference and six people walked away with the paper, and that was good enough to be a printed publication. But the evidence in our record is different in that you eliminate the participation in the meetings. I think that's why it's different. Well, again, that, I guess, gets back to my question. I'm still not really sure why that should matter. If the 20 top spinal surgeons had the information and they were under no restriction about what to do with it, why does that not, as a matter of law, establish that it is publicly accessible? Because we don't know. Unless you had evidence, for example, that said, no, no, you don't know spinal surgeons. They never tell anybody what they have recently learned because they'll lose business. I don't know. The reason, I think, is because there's no evidence in the record that it was available outside that small group. I'd also say that Dr. Linke treated it as a... Just, I mean, I guess I'm going to ask this one more time. Why is that small group not enough? Why is that not public? Because none of them are skilled in the art. They are extraordinarily skilled in the art. So you don't have a person of ordinary skill in the art, as Dr. Linke defined it. So if it was 20 ordinary, ordinary spinal surgeons, that would be okay? I think potentially, yeah, depending on the facts, it could be yes. I'd like to move briefly, if I may, to a couple of other issues. Judge Chen, you asked about the handles in the 928 device, 928 application. The board made a specific finding that in order to move multiple vertebrae, you'd have to move two of the handles, as you suggested. So you twist one handle, it moves one vertebrae in relation to the other. You move a second handle, it moves the other one. I think that's important because one of the things that Medtronic has done is they've separated the claim into snippets and then tried to show how the snippets of the claim are shown in various prior art references. But what the claim requires is that a handle means, that's linked to multiple screw engagement members, is manipulated, is pushed, such that it rotates multiple vertebrae simultaneously to ameliorate or achieve an amelioration of a spinal column deviation. So you have to push the handle or the handles to rotate the spine and then achieve essentially a fix to the spinal. So it's important to recognize that the 928 doesn't show that. The evidence of record that talks about spondylolisthesis and whether or not there's a rotational component to spondylolisthesis shows that, and I don't think this is disputed, spondylolisthesis is a slippage of one vertebrae forward. And so the board said when you reduce that, if you try to pull it back, and they credited Dr. Yoster's testimony, they said there's no significant or meaningful rotation of the spine to do that. They made a factual finding that you're not rotating the spine. The reason meaningful makes a difference is because you're not rotating the spine to achieve the amelioration of the spinal condition. But even if you assume the Medtronic was correct, that any rotation whatsoever that was involved in amelioration of the condition somehow met the claim limitation, it's still not clear from the record how reducing one vertebrae back to the location it was at would satisfy a claim element that requires manipulating a handle means in order to rotate multiple vertebrae to ameliorate the spinal condition. That's why the board focused on incidental, and that's why it makes a difference in the board's finding. And then finally I'll say, well, not quite finally, if I may, on the MTOS connection, we made the argument in the red brief at 46 that Dr. Linke never explained how one would change the MTOS based on the teaches of 928. We argued that if one of us still never picked up the 928, they wouldn't rotate with it because it's small, and for all those various reasons the board found. But we also said Dr. Linke never explained himself. In the gray brief, Medtronic characterized that as astounding. Mouth dry. Astounding. And they point to paragraph 87 of Linke's declaration, and there's a lot of ellipses in that quote because they're pulling little parts of the quote out. But I'll note in paragraph 53, that's in appendix 1478, Linke says the 928 device and the MTOS device are interchangeable. In light of that, I don't know why you'd modify either one of the devices if they're interchangeable. And then the paragraph that they refer to, paragraph 87, at appendix 1510 through 1511, there's four sentences there. He begins by saying, it would have been obvious to modify the device shown in the video, the slides, the MTOS chapter, and Sook, such that the individual handles were linked together in view of the teachings of the 928, the 568, and the 349. He continues to say, the Linke of the handles, by some mechanical means, to ensure the same type of movement, would have been a simple and obvious modification in view of the express teachings of the 349, the 928, by itself or as modified by the 568, or the 568 by itself, to link the handles. He says, this is a simple application of the well-known use of handles and mechanical linking of handles and similar extensions or other mechanical items to further facilitate their movement, using fewer hands, less force, more safely distributing that force or more evenly applying that force, et cetera. Do I take it your point is that the board simply was not required to credit what I think you just tried to convey by reading as a fairly complicated story? I think it's not only complicated, but it doesn't explain anything. It just recites all the different parts of the record in a big grab bag to suggest it would have been easy to compensate. The point is, I guess, linking these different posts together was known and they were out of 928. So why wouldn't it be obvious to do that and then to get the result of being able to move these different things at the same time? I don't know. I'm on my time. May I answer? Yeah. Yeah. So they're Medtronic sort of pulling them together, but they're different ideas. One is, you've got the 928 device. So why would one of the skill in the art looking at this device that by the text of the application says it's small, they were moving away from larger devices. But you see the brackets right there in the figure. Right. And so why would you use that device over in the other one, those linkages? One of the skill in the art is unlikely to do that, and there's no explanation in Linke's declaration for why that would happen. So you move to the MTOS device and you look for a reason, some sort of rationale, why would you link them together. And if you could do it, is there an expectation of success? If not, how would you do it? Some sort of rationale for what you're trying to accomplish. There's simply nothing in the record that supports that, and the board was right to credit Dr. Usir and not credit Dr. Linke, and they're finding that this was not obvious and the claims are valid. But that's all. Thank you, Your Honor. Thank you. Mr. Fleming, three minutes. Thank you, Judge Charanta. Taking the last point first. It's not as though the board looked at the declaration of Dr. Linke that Mr. Alemani just read and said, we find this not credible or that there's some evidence on the other side that says that somehow linking these posts and MTOS together would have been beyond the skill of an ordinary skilled artisan. There's no discussion of it at all. That's the fundamental problem. They stopped once they decided that MTOS itself did not disclose a linkage and did not consider. There's no finding either way. I'm not challenging a finding of the board because there wasn't one. There's a conclusory statement that one wouldn't have modified MTOS by adding a simple linkage as disclosed in the 928, but they don't explain it. I know that you don't have much time. I'd like you to switch back to this troublesome publication issue. How are we to think about the hypothetical of one meeting, 20 top spinal surgeons, they're not told not to do anything with what they take away from the meeting, and that's all we know, and we don't know anything in the record about whether top spinal surgeons would, if asked by a mere ordinary person, say, oh, here, share this or not. I don't think this court has ever suggested,  as long as the reference has been disseminated to the interested public, to people who are most interested in the subject matter. Isn't there some expectation that the interested public can locate that course and share it without having to get somebody's permission? Isn't that the assumption? In order for it to be public, doesn't it have to be available to anyone who would like to locate it and read it or learn from it? I would agree with that, Judge Plager, with the proviso, that they have to exercise reasonable diligence, and I don't think this court has ever said that dissemination is refuted by the fact that you have to get it from someone else. For instance, in Garrett, it was distributed to six commercial companies without restriction on what they did with it. In Enhanced Security Research, the only way to get it was to request it from one or two companies. Now, here, you could have gotten it from Medtronic. At least as I understood Judge Plager's question, which is maybe just a version of a question that I've had in my mind, I thought you needed to say, to disagree with Judge Plager, about the requirement that any old ordinary artisan would be able to get it through reasonable diligence. I thought your position is when you have 20 top spinal surgeons, they have it, they can do anything they want with it, but they're not going to share it at all, that that's still a publication. I think it would be. So that the ordinary artisan couldn't get it. No, I think an ordinary artisan, I mean, in this case, the record is the ordinary artisan, anyone, could get it from the attendees of the conference, and also they could get it by asking for it from Medtronic. That's possible, but there's no evidence that happened. It doesn't need to have happened, as long as it's available. It needs to be disseminated in a way that makes it available to someone of ordinary skill. There's no evidence that it was available. But you don't actually have to point, there is your argument. What was the evidence that was available beyond the people in the room? Well, the people in the room, it was, themselves, it doesn't have to be available to everybody of ordinary skill in the art. It just has to be made available to a significant portion of the interested public. That's the court's decision in Cooper Cameron. And these people qualify, just as the recipients in MIT qualified. There were only six of them. Also, Dr. Yasser, Barry's expert in this matter, admitted on 3762 that it wasn't unusual to get this information from device companies, themselves, about new devices and instruments. This information could have been gotten directly from someone at Medtronic. So even a taking, which I agree, Judge Toronto, we don't need to agree with Judge Plager's position, but even if that is the court's view of what is required, it was satisfied here.  Again, I don't think the board ever reached the question of whether there was some expectation of confidentiality in any of the three meetings. But right now, it doesn't appear from the record that I've looked at that the ball has moved one way or the other on that. Was there an expectation of confidentiality, or was there not? There's a silence on that. And so that's a piece of information, I think, that would be very helpful for the fact finder to know. But there isn't it. We know that you're saying that there was no legal restriction on the people of St. Louis and Colorado, but that doesn't quite answer the question of why there was possibly still an expectation of keeping everything private. That's the court's opinion. The distinction between a legal restriction versus just a more cultural expectation of keeping things closed. I think this court has said on various occasions that the approach to public availability of prior references is broad because the policy is we don't want someone to be able to get a patent on something that's already in the public domain. And as long as something is disseminated to a group of people who are interested in the subject matter, unless there's some reason to think that there was a restriction on their ability to do it, then that is a dissemination for purposes of public availability. Otherwise, you would have situations where there was a dissemination to many more people, as happened in MIT or in Garrett, and simply because no one said, well, there was a specific statement made at this conference that you should feel free to share everything you say, that all of a sudden that could be withdrawn from the public domain of one of skill and the art simply because there hadn't been some specific statement. For the record, a question is not a position. It's only a question. You're quite right, Judge Plager. If I misspoke, I apologize. I meant the premise inherent in your question. I certainly didn't mean to suggest Your Honor had prejudged the issue. Thank you for that correction. Thank you, and the case is submitted. Thanks to all counsel. Thank you, Your Honor.